[S. F. No. 16099. In Bank.—March 24, 1939.]

CHARLEY H. ENGELKING, Appellant, v. F. J. CARLSON et al., Respondents.

Clark, Nichols & Eltse for Appellant.

Call & Stearns, as *Amici Curiae,* on Behalf of Appellant.

Myron Harris, William H. Older and John Jewett Earle for Respondents.

Hartley F. Peart, Howard Hassard and Bronson, Bronson & McKinnon, as *Amici Curiae,* on Behalf of Respondents.

EDMONDS, J.—Each of the defendants in this case is a duly licensed and practicing physician and surgeon who has been sued by the plaintiff for physical injuries alleged to have been sustained as the result of his negligence in the performance of an operation. At the conclusion of plaintiff's case a nonsuit was granted as to defendant Ream, and after hearing the evidence presented by the defendant Carlson, the trial judge directed a verdict in his favor. The appeal is from the judgments which followed the order and verdict.

Dr. Carlson, with the assistance of Dr. Ream, operated upon plaintiff for the purpose of correcting an instability of the left knee. The facts concerning this operation are not disputed. It appears that the operative work consisted of the repair of the exterior lateral and posterior crucial ligaments, which had been torn and ruptured as the result of a fall. The former of these structures runs alongside the knee where the femur comes in contact with the fibula; its function is to hold the knee steady and prevent lateral or sidewise movement. The other runs from the femur to the tibia and prevents an excess of gliding in the knee. The operation in-

volved the removal of the damaged portions of the ligaments, and the substitution therefor of new material obtained by cutting sections from the fascia lata and the biceps muscle of the left leg. It was performed while plaintiff was unconscious and relaxed under the influence of an anaesthetic.

After the operation plaintiff began to suffer from a ''foot drop'', that is, an inability to control the lifting and sidewise movement of the left foot, and also from a numbness in an extensive area of the lower left leg. Upon examination by another physician it was found that the external peroneal nerve in that leg was severed in the vicinity of the knee. This nerve runs down the side of the leg below the knee and affects the muscles which raise the foot. A severance of it, according to the medical testimony, will produce the difficulties experienced by plaintiff.

Dr. Carlson was the only physician called by the plaintiff who testified concerning what was done by him and Dr. Ream and the procedure ordinarily employed by surgeons performing an operation of the kind submitted to by the plaintiff. Admittedly, the peroneal nerve, the position of which does not vary normally, is in the operative field. Although this nerve can be isolated, said Dr. Carlson, it is not the practice to do so in operations of this kind. Accordingly, after he made the necessary incision and the cutting progressed through the skin, the fascia, and other structures down to the bone, the surrounding muscles and tissues were drawn aside and held back by blunt retractors, which were adjusted by him and maintained in position by Dr. Ream. Dr. Carlson handled all of the sharp instruments; Dr. Ream did nothing except to hold the retractors.

After the operation was completed a check was made to see whether the nerve was cut. This was done by looking at the tissues which had been dissected and all of them were identified. The nerve was not sutured, said Dr. Carlson, because, in his opinion, that was not required. Asked if ''you can state positively that neither you nor Dr. Ream severed this nerve'', Dr. Carlson replied that he could not say, although he did not do any cutting ''in the neighborhood of it''. ''The severance of this nerve is a problem that is one of the difficulties of surgery.'' Although it does not ordinarily happen, he continued, it is something which may occur. ''The nerve can be injured by pulling on a blunt in-

strument alone, and the problem as to whether or not that was true was our first problem after the operation.''

Asked a hypothetical question concerning what method would ordinarily be employed ''by a physician and surgeon possessing the reasonable degree of skill and knowledge possessed by others of his profession in good standing in the East Bay Area'' to protect the peroneal nerve during such an operation, Dr. Carlson answered: ''To retract it with its protective tissue.'' However, he said, in doing so it might be stretched with temporary loss of function. He also very frankly said that although the peroneal nerve is not difficult to locate and identify, a surgeon can miss it and thereby cause injury. Several instances where that had occurred were mentioned by him and his testimony in this regard was corroborated by two well-qualified surgeons who were called as witnesses in his behalf. One of them said that in average surgical practice the peroneal nerve is cut in five per cent of operations such as that undergone by the plaintiff; another stated that it is severed even by those using care and skill in over five per cent of the cases, some authorities claiming that the number runs to eight or nine per cent. Each of these witnesses declared that it is standard technique to leave the nerve covered in its own protective tissue rather than to expose it because exposure is more likely to cause injury; to retract the nerve with the tissues is the most conservative method.

■ The plaintiff contends that with this evidence before the jury the trial judge should not have granted a nonsuit or directed a verdict. He insists that the evidence offered by him together with the reasonable inferences legitimately deducible therefrom, would support a verdict in his favor upon the theory (1) that the condition of the left foot and leg subsequent to the operation was due to the severance of the peroneal nerve; (2) that this nerve became severed in the course of the operative work upon the ligaments; and (3) that such severance was the result of negligence in the performance of the surgical work.

The first of these propositions is supported by expert evidence introduced by the plaintiff, and is not controverted by the defendants. The second proposition also requires no consideration, because the defendants take the position that for the purpose of passing upon the particular rulings of the

trial court under review, "the sufficiency of plaintiff's evidence upon this point and the reasonableness of his inference that the nerve became severed in the course of the operation, may be assumed". The third proposition states the principal controversial point. Conceding that the evidence stands undisputed, the plaintiff contends that it justifies an inference of negligence under the doctrine of *res ipsa loquitur*. He insists that he was unconscious; that the defendants had charge of the operation; that the result suffered by him does not ordinarily occur; and that in the absence of an explanation by the defendants justifying a verdict in their favor upon the ground that they were not negligent, they are liable to him in damages.

If this were the rule, as a practical proposition, no surgeon could ever operate without being an insurer of a medically satisfactory result. The medical testimony in this case shows without any contradiction whatever that although the severance of the peroneal nerve is something which ordinarily does not occur in operations such as that performed by Dr. Carlson, yet even when the precautions prescribed by the approved technique are taken, there is a break of or injury to it in between five and nine per cent of the cases. There is nothing startling about such evidence and it affords no basis for the recovery of damages against a surgeon. Probably in every operation there is some hazard which the medical profession recognizes and guards against but which is not always overcome. To say that the doctrine of *res ipsa loquitur* allows the recovery of damages in every case where an injury does not ordinarily occur, would place a burden upon the medical profession which the law has not heretofore laid upon it. Moreover, such a rule is not justified by either reason or authority.

The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice. It requires only that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality and that he shall use ordinary care and diligence in applying that learning and skill to the treatment of his patient. (*Hesler* v. *California Hospital Co.*, 178 Cal. 764, 174 Pac. 654].) Whether he has done so in a particular case is a question for experts and can be established only by their testimony. (*Perkins* v. *True-*

*blood,* 180 Cal. 437 [181 Pac. 642] ; *Patterson* v. *Marcus,* 203 Cal. 550 [265 Pac. 222].) ■ And when the matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen, the expert evidence is conclusive. (*Wm. Simpson C. Co.* v. *Industrial Acc. Com.,* 74 Cal. App. 239 [240 Pac. 58] ; *Johnson* v. *Clarke,* 98 Cal. App. 358 [276 Pac. 1052].) ■ Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved. On the contrary, in the absence of expert evidence, it will be presumed that a physician or surgeon exercised the ordinary care and skill required of him in treating his patient. (*Donahoo* v. *Lovas,* 105 Cal. App. 705 [288 Pac. 698].)

■ It is true that in a restricted class of cases the courts have applied the doctrine of *res ipsa loquitur* in malpractice cases. But it has only been invoked where a layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised. For example, it has been applied where a sponge was left in the body of the patient after closing an operative incision. (*Ales* v. *Ryan,* 8 Cal. (2d) 82 [64 Pac. (2d) 409] ; *Armstrong* v. *Wallace,* 8 Cal. App. (2d) 429 [47 Pac. (2d) 740] ) ; where the patient was burned by the application of hot compresses or heating apparatus (*Timbrell* v. *Suburban Hospital,* 4 Cal. (2d) 68 [47 Pac. (2d) 737] ; *Meyer* v. *McNutt Hospital,* 173 Cal. 156 [159 Pac. 436] ; *McCullough* v. *Langer,* 23 Cal. App. (2d) 510 [73 Pac. (2d) 649] ) ; where the patient was burned through the operation of an X-ray machine (*Moore* v. *Steen,* 102 Cal. App. 723 [283 Pac. 833] ; *Ragin* v. *Zimmerman,* 206 Cal. 723 [276 Pac. 107] ) ; and where the patient sustained an infection through the use of an unsterilized hypodermic needle (*Barham* v. *Widing,* 210 Cal. 206 [291 Pac. 173] ). In each one of these situations the rule was applied because common knowledge and experience teaches that the result was one which would not have occurred if due care had been exercised.

But the present case shows an entirely different situation. Here what was done lies outside the realm of the layman's experience. Medical evidence is required to show not only what occurred but how and why it occurred. ■ That evidence establishes beyond question not only that the peroneal nerve

may be injured even where due care is used but that this unfortunate result invariably occurs in a limited number of cases. The doctrine of *res ipsa loquitur* is, therefore, entirely inapplicable and no malpractice has been proved.

The judgments are, and each of them is, affirmed.

Curtis, J., Houser, J., Shenk, J., Waste, C. J., and Langdon, J., concurred.

SEAWELL, J., Dissenting.—I dissent.

I am of the view that the decision rendered by the District Court of Appeal, First Appellate District, Division Two, Nourse, P. J., correctly states the law of the case and it cannot in principle be distinguished from *Brown* v. *Shortlidge*, 98 Cal. App. 352 [277 Pac. 134], *Ales* v. *Ryan*, 8 Cal. (2d) 82 [64 Cal. (2d) 409], *Thomsen* v. *Burgeson*, 26 Cal. App. (2d) 235 [79 Pac. (2d) 136], and *Armstrong* v. *Wallace*, 8 Cal. App. (2d) 429 [47 Pac. (2d) 740], and a number of the decisions of this court where the doctrine of *res ipsa loquitur* has been considered in its relation to kindred situations. The doctrine is not novel in its application to cases of this kind. It is applied in cases in which the person is charged with negligence by reason of his superior knowledge and exclusive control of the agency which caused the injury. All that the law requires, is that the defendant charged with negligence rebut the presumption of negligence by giving a reasonable explanation of the cause of injury. The application of the doctrine should not be arbitrarily limited to certain fields and extended to others when there is no good reason for making a distinction. It is difficult to understand why the cases cited herein can be regarded as stating the true principle if the doctrine, in the instant case, is sound.