[Civ. No. 15402. Second Dist., Div. Three. June 24, 1947.]

CECIL E. CHURCH et al., Appellants, v. J. L. BLOCH et al., Respondents.

Hiram T. Kellogg for Appellants.

Reed & Kirtland and Henry E. Kappler for Respondents.

WOOD, J.—Plaintiffs, husband and wife, commenced this action to recover damages for personal injuries allegedly sustained by the wife as the result of the negligence of Dr. Jessie L. Bloch in rendering medical services. A jury was impaneled. At the conclusion of plaintiffs' case, counsel for Dr. Bloch made a motion for nonsuit on the grounds that there was no proof insofar as the allegations of the complaint are concerned that Dr. Bloch was negligent, and that there was no evidence that "any condition" the wife has or ever did have was proximately caused by any negligence as alleged in the complaint on the part of Dr. Bloch. The motion was granted, and the court also ordered a nonsuit as to defendant California Physicians Service. Plaintiffs appeal from the judgments of nonsuit.

Appellants contend that the evidence was sufficient to establish a prima facie case of negligence warranting submission of the question of fact to the jury.

The complaint alleged in substance that the California Physicians Service is a corporation engaged in the business of selling memberships under which said corporation agrees to furnish medical care and services to its members and their families; that plaintiffs had purchased a membership in said corporation; that at all times mentioned therein Dr. Bloch was acting as the agent or servant of said corporation; that plaintiff Jewel Church gave birth to a child on July 25, 1943; that, pursuant to the agreement with the said corporation, Dr. Bloch acted as her physician and surgeon, giving her prenatal care and attending the delivery; that defendants so negligently performed their services that a breech birth occurred; that as a result of said negligence plaintiff Jewel Church suffered injuries to her person, including lacerations and tearing of the tissue, an erosion of the cervix, an infection of the uteral genital tract, and a general impairment of her health; that she is still receiving medical care and attention for the injuries so sustained, and as a result of such negligence she has suffered damages in stated amounts. As a second cause of action plaintiff Cecil E. Church alleged damages for loss of his wife's companionship and society.

Plantiff testified that she first consulted Dr. Bloch in February, 1943; that he took a history of her case, gave her a

physical examination, and told her the baby would be born about August 4, 1943; that she returned to him for medical attention periodically thereafter; that on one visit to his office he told her husband to get her to the hospital in a hurry when she "gets sick" because the baby is "coming quick"; that she went to him for treatment three times in July—on the 3d, 7th and 21st; that on one of those visits she had swollen ankles and he gave her a prescription; that on the 21st she told him she did not feel well, and felt that the baby's head was up under her ribs; that on that occasion Dr. Bloch said she was doing all right; that at no time during the pregnancy did he make a stethoscopic examination of her abdomen or take any X-rays; that labor pains started about 1 p. m. on July 24, 1943; that she arrived at the hospital about 8 p. m.; that about one hour later a Dr. McCracken, whom she had never seen but who she had heard was Dr. Bloch's assistant, came in and examined her and remained about 15 minutes; that she, the nurses and her husband were then alone in the room until Dr. Bloch arrived "just before" 3 a. m., and the baby was born at 3 a. m.; that Dr. Bloch left immediately thereafter, and she next saw him on the following day when he "stuck his head in the door" of her room and asked her how she was; that she told him she felt terrible; that he did not come into the room or reply to her, but made a remark about the weather and a $50 fee, and then departed; that the next time she saw him was 13 days later when she took the baby to his office; that she did not talk with the doctor at that time, but she told the nurse that she did not feel right, and the nurse told her she would have to wait and come back for her "8-weeks check-up"; that she was in so much misery that she could not wait and she returned to Dr. Bloch's office about September 17, 1943, at the end of the seventh week; that at that time her legs tingled, she felt weak and dizzy, her head ached, and her left side from under the ribs down felt like she had been scraped "or something"; that she told Dr. Bloch that she felt there was something drastically wrong with her, and she didn't feel right at all; that Dr. Bloch gave her a vaginal examination, told her she was coming along nicely, and gave her a prescription but did not tell her what it was for; that that was the only vaginal examination he had given her except one he gave her when she first consulted him in February; that thereafter she changed doctors and went to a health clinic three times a week for over a month; that she then went to a Dr. Coleman and a Dr. Swartz for a period of

about 6 months; that when she first went to them she told Dr. Coleman that her back ached, and she was sore all through the lower abdomen, and her left leg and left hip bothered her; that she told him the condition started in June, 1943, before the child was born; that they took X-rays of her lower abdomen, her hip, chest and back; that Dr. Coleman's treatments included "shots" for her hip, diathermy to her pelvic region, and he told her she should have a rest; that she then went to New Mexico where her family lived, and there consulted a Dr. Thearle who put her in a sanitorium; that he treated her all the time she was in the sanitorium; that he gave her iron and liver injections each day, and treated her blood; that she was on a special diet, and received vaginal swabbings; that she remained in the sanitorium 3 months and then consulted a Dr. Tanny; that she gave him a history of "discharge," and he told her she would have to undergo a major operation; that on November 27, 1944, Dr. Tanny performed surgery through the vaginal canal in the abdominal region on her pelvic organs; that she was not on her feet again until the latter part of February, 1945; that she was under Dr. Tanny's care after that, and last saw him on November 28, 1945.

Plaintiff Cecil E. Church testified that he telephoned Dr. Bloch's office about 2:30 p. m. on July 24, 1943, and talked to the secretary about taking his wife to the hospital that day for the birth of the child, and he told the secretary he would call again about 5 p. m.; that he called again about 5 p. m., and told the secretary to inform Dr. Bloch that he was taking his wife to the hospital; that they arrived at the hospital about 7:30 p. m.; that the baby was born about 3 a. m.; that after the baby was born Dr. Bloch made no sutures, and left the room immediately; that when his wife went to Dr. Coleman's office she was complaining of her side and kidney; and that she was still unable to do all of her household duties.

Dr. Coleman, an osteopathic physician and surgeon, testified that Mrs. Church came to his office on November 17, 1943, at which time she complained of her back, left leg and hip; that she said her leg went numb and bothered her before and after the birth of the child, and she was very nervous and irritable; that he gave her a vaginal examination, and found a severe and large erosion of the cervix; that in his opinion

it was of long standing, and had been present several years; that he did not believe the ulceration was infected, but it may have contributed to her nervous irritability; that all he did was treat her for the erosion and his associate, Dr. Swartz, treated her for chest conditions.

Dr. Swartz testified that Mrs. Church gave him a history of having had a cough 2 weeks before she came to him, of loss of weight, no tubercular contact, no coughing up of blood, no history of heart trouble, and no operations or previous diseases except bronchial pneumonia two years previous to consulting him.

Defendant Jessie L. Block, M. D., called under section 2055 of the Code of Civil Procedure, testified that he is a physician and surgeon, licensed to practice as such in California; that he is a general practitioner, and at the time he rendered medical services to Mrs. Church obstetrics was a part of his general practice; that he agreed to take care of Mrs. Church during her pregnancy, and to give postnatal care if necessary; that he gave her a physical examination on March 4, 1943, at which time he found she had a 1-plus systocele, a 1-plus rectocele, and mild lacerations of the cervix which had been caused by a previous childbirth and had healed; that had he attempted to do surgery on the lacerations he would have caused an abortion; that Mrs. Church had a breech presentation; that 3 per cent of the babies born are breech presentations; that in a breech presentation the delivery is slower, and the dilation of the cervix is not regular as it is in a head presentation; that the cervix may be torn badly in a breach presentation; that doctors ''take care'' of bad lacerations, but if the cervix is a ''little frayed'' they can't do anything with it except let it heal; that the healing process takes longer than 6 or 8 weeks; that if the laceration becomes irritated, that is, if the cells become activated by the acid secretions of the vagina then an erosion takes place; that when he examined Mrs. Church 7 weeks after the birth of the baby she said she felt a little weak, and he gave her a tonic; and that he made a vaginal examination at that time and found no open lacerations or erosion of the cervix.

A doctor of medicine, who had practiced in this community since 1912, was called by plaintiffs and qualified as an expert in obstetrics. He was asked a hypothetical question based upon assumed facts, justified by and embodied in the evidence, concerning the medical treatment of Mrs. Church

prior to and during the birth of the child. He testified that in his opinion Dr. Bloch did not use the ordinary care and skill of a practicing physician in this locality in the light of practices existing at that time; that a practitioner using ordinary care and skill in this locality, under the circumstances related in the hypothetical question, would have taken an X-ray, and upon finding the child in an inverted position, he should have done something to turn the child; that "lots" of times this may be accomplished by manipulation of the abdomen before the labor pains become severe, and if that cannot be done and the labor starts the doctor can reach up inside and either get hold of the feet or try to push the child back to bring the head down first. He also testified that an erosion is an ulcerated tear which stays open and doesn't heal up; that those severe tears should be repaired as soon as possible, and they try to repair them right after the delivery. On cross-examination he testified that 3 per cent to 5 per cent of births are breech births; that there are some physicians in good standing in this community who are of the opinion that babies should not be turned; that those doctors who entertain such an opinion represent a respectable minority of physicians in the community; that in this particular case if the doctor saw the patient about 13 days after the birth and again about 8 weeks after the birth and made a vaginal examination that it probably would be good practice, but he thought they should be seen more often than that; that generally speaking, physicians usually make more than one or two observations of the mother after the child is born and the mother has left the hospital.

■ The general rule is that the propriety or impropriety of particular medical treatment can be established only by expert medical testimony. (*Inderbitzen* v. *Lane Hospital*, 124 Cal.App. 462, 467 [12 P.2d 744, 13 P.2d 905].) Respondents assert that since the expert medical witness, called in behalf of plaintiffs, testified that there is a respectable minority of physicians in good standing in the community who are of the opinion babies should not be turned, there was no negligence on the part of Dr. Bloch in not taking X-rays or attempting to turn the child. It was stated in the case of *Sim* v. *Weeks*, 7 Cal.App.2d 28, at page 37 [45 P.2d 350]: "A charge of negligence in a choice of treatment is refuted, as a matter of law, by showing that a respectable minority of expert physicians approved the method selected." It appears, from the

expert medical testimony introduced by plaintiffs, that Dr. Bloch chose a recognized and approved method of practice in not taking X-rays or attempting to turn the child.

A question arises as to whether Dr. Bloch, having chosen a recognized and approved method of practice, used ordinary care in the performance of his treatment of Mrs. Church. In addition to selecting a recognized and approved method of treating a patient, a physician, in pursuing such method, is required to use that degree of care ordinarily exercised by reputable physicians practicing in the same locality.

The evidence shows that Dr. Bloch did not arrive at the hospital to attend his patient until 15 minutes before the baby was born, and more than 9 hours after his secretary had been notified that the patient was being taken to the hospital; that he left immediately after the baby was born; that the next day, when he appeared at the door of her room and she told him she felt "terrible," he prescribed no treatment for her; that he did not see her again for 7 weeks, at which time he gave her a vaginal examination and told her she was coming along nicely; and that about 2 months later a vaginal examination by another doctor disclosed the presence of a severe erosion of the cervix which, in the opinion of the examining doctor, had been present several years. Although such evidence may indicate to a person who is not a member of the medical profession that Dr. Bloch failed to use ordinary care in treating Mrs. Church and that he was guilty of malpractice, the test or standard to be applied in determining whether he used the ordinary care required of him is the standard set by the care ordinarily exercised by others of the same profession in good standing in the same locality. Such standard can be ascertained only from expert medical testimony. There was no expert medical testimony, other than that based on the hypothetical question above referred to, that defendant did not exercise the degree of care ordinarily exercised by physicians of good standing practicing in the locality. That hypothetical question pertained only to the questions as to whether X-rays should be taken to determine the position of the baby, and whether the baby should be turned; and as to those questions the expert testimony indicated, as above stated, that defendant adopted an approved method. Appellants argue that the facts, disclosed by the evidence, show as a matter of common knowledge that defendant did not exercise ordinary care. It is true that where "negligence on the part of a doctor is demonstrated by facts

which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact.'' (*Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604].) However, it cannot be said that as a matter of common knowledge the treatment accorded Mrs. Church was not within the standard required of physicians in that community. Certain evidence presented on behalf of plaintiffs indicates that Dr. Bloch was more interested in the amount of money he should receive than he was in the welfare of his patient, and that he intended to give her the minimum of medical attention in assertedly performing the professional duties required of him. There was testimony that about four days prior to the birth of the child he demanded that plaintiffs pay him $50, stating that although he was under contract with the California Physicians Service it ''was not paying off enough,'' and that plaintiffs would have to get a ''quack'' to deliver the baby if they did not ''make arrangements to pay this $50.'' (At the time of the birth they had made no payment to him.) While that testimony does not indicate a commendable professional attitude, the jury could not have determined therefrom that he failed to use the degree of care required of him. Whether he exercised the requisite degree of care was a matter peculiarly within the knowledge of medical experts.

The judgments and orders granting the motions for nonsuits as to both defendants are affirmed.

Shinn, Acting P. J., and Kincaid, J. pro tem., concurred.