[Civ. No. 9766.   Third Dist.   Mar. 14, 1960.]

DODSON LAMB, Appellant, v. HERBERT L. MOORE, Respondent.

Barbagelata, Zief & Carmazzi, Rinaldo A. Carmazzi and Arthur C. Zief for Appellant.

Peart, Baraty & Hassard, Alan L. Bonnington, Ricky J. Curotto, Hill & Hill and Clayton Rost for Respondent.

SCHOTTKY, J.—Dodson Lamb brought an action against Dr. Herbert L. Moore and the Trinity Hospital of Arcata to recover damages for an injury to his leg allegedly caused by negligent treatment furnished by Dr. Moore and the hospital when he was under their care for treatment of a fractured leg. The hospital was dismissed from the case during the trial. A nonsuit was granted Dr. Moore at the conclusion of plaintiff's case. Mr. Lamb has appealed from the judgment in favor of Dr. Moore.

On August 19, 1953, appellant broke his left leg while at work. He was taken to Trinity Hospital of Arcata and Dr. Moore was called to treat him. The leg was X-rayed and a diagnosis was made by Dr. Moore that there was a comminuted displaced fracture of the left tibia and fibula. Dr. Moore testified under section 2055 of the Code of Civil Procedure that he had reduced the fracture and when he had completed the reduction the bones were aligned very well with between 80 and 90 per cent apposition. A cast was then placed over the limb. The leg was X-rayed again on August 24, 1953, and in the doctor's opinion the results were satisfactory. Appellant left the hospital the next day. He visited Dr. Moore at his office on September 1, 1953. Again X-rays were taken. Appellant also saw Dr. Moore on September 15th and on September 21st. An X-ray was taken on September 21st. Dr. Moore felt that the X-ray showed a good result. On September 21st appellant terminated his relationship with Dr. Moore, and the next day he saw another doctor who, after examining the X-rays, reported to the insurance carrier for appellant's employer that the X-rays "show a transverse fracture at the junction of the middle and distal ⅓'s of the left tibia and fibula with an approximate 15° angulation and with good apposition. The angulation, unfortunately, is with the apex medially, giving the patient a definite valgus foot." The break was reset in order to get a more perfect state of alignment to get rid of the valgus deformity and get a more perfect apposition. The X-rays disclosed that there was no apposition of the fibula, but Dr. Moore testified that this was unimportant because a doctor does not attempt to set the fibula unless the break is close to the ankle joint.

Both Mr. and Mrs. Lamb testified that after the cast was on Mr. Lamb complained of severe pain and that Mr. Lamb was subject to fainting spells. Mrs. Lamb testified she told Dr. Moore about the fainting spells and he told her that it was merely nerves. Mr. Lamb testified that he fainted while being examined in Dr. Moore's office. Dr. Moore testified that appellant fell back while on the X-ray table but that there was no loss of consciousness. Mrs. Lamb also testified that when Dr. Moore bivalved the cast in his office on September 21st her husband's foot flopped over; that Dr. Moore said that the leg bone was knitting all right and that it would be fine; and that she told Dr. Moore she thought that something was wrong with her husband's foot and he replied, "Well, if there's anything wrong the cast will take care of it."

822

As stated by this court in the case of *Wickoff* v. *James,* 159 Cal.App.2d 664, at page 667 [324 P.2d 661]:

"In considering whether or not a judgment of nonsuit was proper, an appellate court must 'resolve every conflict in their testimonies in favor of plaintiff, consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence adduced, direct and indirect, which tends to sustain plaintiff's case.' (*Lashley* v. *Koerber,* 26 Cal.2d 83, 84 [156 P.2d 441].) In any malpractice case negligence on the part of the doctor will not be presumed, it must be proved except in those cases where res ipsa loquitur is applicable. . . ."

The doctrine of res ipsa loquitur would apply only if it were shown that the occurrence were one that does not ordinarily occur in the absence of negligence. (*Wickoff* v. *James, supra.*) This knowledge may in proper cases be common knowledge on the part of lay individuals but ordinarily it will require expert testimony.

We do not believe that the doctrine of res ipsa loquitur was applicable to the instant case. The basis of appellant's cause of action was that he suffered permanent injury to his leg because of negligent treatment. The evidence disclosed that while the tibia was healing angulation ensued which resulted in a valgus or flat foot. One cannot say that it is a matter of common knowledge that angulation or a valgus foot does not occur in the treatment of a bone fracture of the tibia unless there was negligence in the treatment. There was no expert testimony on this point. This is a matter which is outside the layman's realm of experience. (Accord *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560 [317 P.2d 170]; *Wickoff* v. *James, supra.*)

A more serious question is whether or not appellant made out a prima facie case of negligence. Appellant first contends that the failure of Dr. Moore to bivalve the cast prior to the 21st of September was negligence. There was a direct conflict in the evidence as to the date the cast was cut. Taking the latter date (September 21st) and conceding that appellant complained of pain and had fainting spells and that good practice would involve bivalving or splitting the cast, the question would still remain whether or not the negligence of the doctor caused weakness in the leg. There is no showing of causation.

■    As stated in *Huffman* v. *Lindquist,* 37 Cal.2d 465, at page 473 [234 P.2d 34, 29 A.L.R.2d 485] :

''There are certain general principles to be noted in relation to malpractice cases. The 'law has never held a physician or surgeon liable for every untoward result which may occur in medical practice' (*Engelking* v. *Carlson,* 13 Cal.2d 216, 220 [88 P.2d 695] ; *Lashley* v. *Koerber, supra,* 26 Cal.2d 83, 88-89 [156 P.2d 441]) but it 'demands only that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he exercise ordinary care in applying such learning and skill to the treatment of his patient' (*Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86 [147 P.2d 604]).    ■    No different or 'higher degree of responsibility' is imposed 'in making a diagnosis than in prescribing treatment.' (*Patterson* v. *Marcus,* 203 Cal. 550, 552 [265 P. 222] ; see also *Ries* v. *Reinard,* 47 Cal.App.2d 116, 119 [117 P.2d 386].)    ■    A doctor's failure to possess or exercise the requisite learning or skill 'in a particular case is generally a question for experts and can be established only by their testimony' (*Trindle* v. *Wheeler,* 23 Cal.2d 330, 333 [143 P.2d 932] ; also *Church* v. *Bloch,* 80 Cal.App.2d 542, 547 [182 P.2d 241]), which 'expert evidence is conclusive' where it appears that the 'matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen' (*Engelking* v. *Carlson, supra,* 13 Cal.2d 216, 221). . . .

''    .    .    .    .    .    .    .    .    .    .    .

'' 'Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved.' (*Engelking* v. *Carlson, supra,* 13 Cal.2d 216, 221; *Lashley* v. *Koerber, supra,* 26 Cal.2d 83, 89.) . . .''

Appellant also contends that the doctor was negligent in not sending him to the hospital when he complained of pain and fainting. The doctor testified that he did recommend to appellant that he return to the hospital on September 1st. There is no denial of this, but even so this fact does not provide causation.

■    Appellant next contends that if the X-ray pictures show a shocking result (as appellant contends they do) ''[t]hen the jury should decide whether to believe what they observe with their own eyes or the testimony of the respondent doctor who said the leg was set and healing properly; the failure to possess the degree of skill, care and learning of a general practitioner under the circumstances of this case, e.g.,

failure to correctly read and interpret X-rays, can be proved by common reason and experience.'' Appellant argues that it is a matter of common reason and experience that the X-rays taken on September 21st show neither apposition nor alignment and that any layman by examining the X-rays can see that the fractured leg had not been reduced and that the X-rays depict a ''horrible example of an imperfect result.'' If it be conceded that the X-rays show faulty reduction and a faulty result, the jury could not draw the conclusion that there had been malpractice. (*Huffman* v. *Lindquist, supra.*)

Another difficulty with appellant's argument is that it requires a licensed physician and surgeon to read and interpret X-rays and in extreme cases the aid of a roentgenologist is necessary, and thus it is obvious that a lay person cannot utilize his common knowledge and experience in matters of this kind. In 3 Wigmore on Evidence, section 795, page 191, it is stated:

''The *interpretation* of an X-ray photograph becomes a matter of vital importance. This is because the X-ray photograph reveals only a shadow, and the significance of this shadow depends on the nature of the anatomical or pathological data existing within the body that is X-rayed; hence on the one hand, not every X-ray photographer is qualified (*ante*, § 560), by understanding of the data involved to interpret the picture; nor, on the other hand, is a specialist in some field of anatomy or pathology necessarily qualified to interpret a photograph of such data. A special professional branch for such interpretation has developed—the roentgenologist.

''The issues in which a roentgenologist should be required will be rare. But in every instance of use of an X-ray photograph, there *must be interpretation of it by a witness qualified to interpret* photographs of that class of data. And the ordinary technician is not so qualified merely by reason of his skill as a technician. . . .''

We believe that the following statement of the trial court in granting the motion for a nonsuit is sustained by the record and the law:

''Granting that the pictures show some results that are—that might be shocking to a layman—I don't believe that a layman can say, under the law, that it is an indication of negligence or a standard of practice that is not in accordance with that which prevails in the locality.

''There is no evidence whatsoever to that effect and I don't

believe it comes within the rule of those cases where we can rely upon common knowledge of practice prevailing.''

If appellant were correct in his statement that any layman is competent to examine the X-rays and determine that respondent was negligent in his treatment, the granting of the nonsuit would be erroneous. But only a person qualified to read and interpret the X-rays could make such a determination. At most, a review of the X-ray films by a lay person, untrained in the reading and interpretation of them, might indicate an untoward result. It certainly could not establish a want of proper or average care and skill on the part of respondent, or that any other treatment under the circumstances could or would have produced a better or different result. As stated in *Huffman* v. *Lindquist, supra,* the '' 'law has never held a physician or surgeon liable for every untoward result which may occur in medical practice' '' and '' '[n]egligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved.' ''

Notwithstanding the well-settled rule that in considering whether a judgment of nonsuit was proper an appellate court must resolve every conflict in favor of the plaintiff and give to plaintiff the benefit of every inference that may reasonably be drawn from the evidence, we are convinced that in view of the well-settled principles relating to malpractice cases the evidence in the instant case was insufficient to support a judgment in favor of plaintiff and that the judgment of nonsuit was proper.

The judgment is affirmed.

Van Dyke, P. J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied April 6, 1960, and appellant's petition for a hearing by the Supreme Court was denied May 11, 1960. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.