[Civ. No. 19889.   First Dist., Div. Two.   May 17, 1962.]

BERNICE STEPHENSON, Plaintiff and Appellant, v. KAISER FOUNDATION HOSPITALS et al., Defendants and Respondents.

Charles R. Garry, Jonathan H. Rowell, Francis J. McTernan and Garry, Dreyfus & McTernan for Plaintiff and Appellant.

Leonard J. Bloom, James M. Fletcher and Kennedy, Bloom & Fletcher for Defendants and Respondents.

KAUFMAN, P. J.—Appellant, Bernice Stephenson, commenced this action to recover damages for malpractice, alleging that respondent, Dr. Lelich, while acting as a partner in the respondent partnership, Permanente Medical Group, for respondents, Kaiser Foundation Hospitals and Kaiser Foundation Health Plan, Inc., was negligent in making an erroneous diagnosis that she was pregnant, thus causing her to postpone an operation for the removal of a uterine tumor. The only question presented by this appeal from the judgment entered on a directed verdict in favor of the respondents[1] is whether there is any evidence in the record from which the jury could have found for the appellant.

The record reveals the following facts: the appellant, who, at the time of trial (1960) was 43 years of age, had been a member of the Kaiser Foundation since 1953. She had been told about a fibroid tumor in her uterus in 1951 but had no trouble with it and did nothing about it. In 1954 and 1955, she was advised by several doctors at Kaiser that surgery was needed for the tumor, but she did not keep an appointment for surgery in May 1955. The appellant first saw Dr. Lelich in January 1956, in the course of a general physical examination. He mentioned the tumor but appellant indicated she wanted to wait until April for the recommended surgery. In early April 1957, appellant became ill and on April 23, 1957, came to see Dr. Lelich. She was examined and X-rays taken and scheduled for surgery to remove the tumor on April 29. At this time, she indicated her last menstrual period had been on April 15. She entered the hospital on April 28. The X-rays indicated no fetal skeleton or other sign of pregnancy. Because the size of her tumor imposed certain limits on the clinical examination and because he suspected that the tumor could be hiding an early pregnancy, which would not show up on the X-ray, Dr. Lelich ordered certain laboratory tests before surgery. As the result of the laboratory test for pregnancy was positive, appellant's surgery was postponed and appellant discharged from the hospital on May 2. She was told to report in two weeks or sooner if symptoms developed. On May 16, 1957, the appellant again saw Dr. Lelich, complained of menstrual bleeding and indicated that she did not feel at all pregnant. She also indicated to the doctor that his diagnosis of pregnancy kept

---

[1] It was stipulated at the beginning of trial that if one of the respondents was liable, all of them were.

her from obtaining disability payments as she could not work. She was examined again and told to report back.

On June 19, the appellant returned and Dr. Lelich again examined her. As he could not hear any fetal heart tones, he ordered another laboratory test for pregnancy. Again, the result was positive. Appellant insisted that she could not be pregnant as she was bleeding regularly. She was told she had to wait several months until the diagnosis of pregnancy could be verified but no specific return appointment was made. Appellant was at the Kaiser clinic in July 1957 for a neck ailment. She did not see Dr. Lelich or any gynecologist at this time or thereafter until October 29, 1957, when she again came to see Dr. Lelich. At this time, another X-ray was taken. As no fetal skeleton appeared on the X-ray, appellant was informed that the earlier diagnosis of pregnancy had been erroneous, and she again was scheduled for surgery for removal of the tumor. Dr. Lelich filed a revision of diagnosis with the state, so that the appellant was able to receive state unemployment benefits for the period of her illness from April until October. Appellant informed the doctor she wanted to wait for the operation. Dr. Lelich called her several times about scheduling the operation and appellant again indicated she wanted to postpone it until the new year. Early in January, she had an argument with Dr. Lelich about the extent of surgery recommended as she did not want all of her uterus removed. Finally, she informed him she wanted to see another doctor. In January 1958, the surgery was performed on the appellant at a private hospital at appellant's expense.

Appellant contends that the evidence established a prima facie case of negligence in diagnosis and treatment on the part of the respondents and that, therefore, the trial court erred in granting the motion for a directed verdict. ■ On an appeal from a judgment entered on a directed verdict, as in an appeal from a judgment of nonsuit, only the evidence most favorable to the plaintiff need be considered (*Wickoff* v. *James*, 159 Cal.App.2d 664 [324 P.2d 661].) ■ Moreover, we must resolve every conflict in the testimony in favor of the plaintiff, consider any inference which can be reasonably deduced and every presumption which can fairly be deemed to arise in support of the plaintiff and accept as true all evidence adduced, direct and indirect, which tends to sustain the plaintiff's case (*Lashley* v. *Koerber*, 26 Cal.2d 83, 84 [156 P.2d 441]), including testimony adduced under section 2055 of the Code of Civil Procedure (*Towers* v. *Massey-Harris Co.*, 145 Cal.App.2d 210 [302 P.2d 77]).

The general principles applicable to malpractice actions are that negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved (*Engelking* v. *Carlson*, 13 Cal.2d 216, 221 [88 P.2d 695]; *Lashley* v. *Koerber, supra*), except where res ipsa loquitur is applicable (*Wickoff* v. *James, supra*.) But this is clearly not a res ipsa loquitur case, for here what was done lay outside the realm of the layman's experience (*Lamb* v. *Moore*, 178 Cal. App.2d 819 [3 Cal.Rptr. 507]).

The doctor is held in the practice of his profession to that reasonable degree of skill and learning generally possessed by others of his profession in the same locality and to the exercise of reasonable and ordinary skill in the application of that learning. Ordinarily, proof of the prevailing standard of skill and learning in the locality and proof on the question of the propriety of particular conduct by the practitioner in particular instances is not a matter of general knowledge and can only be supplied by expert testimony (*Patterson* v. *Marcus*, 203 Cal. 550 [265 P. 222]; *Trindle* v. *Wheeler*, 23 Cal.2d 330 [143 P.2d 932]; *Church* v. *Bloch*, 80 Cal.App.2d 542, 547 [182 P.2d 241]). Expert evidence is conclusive where it appears that the matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen.

In order to determine whether the appellant has made out a prima facie case of negligence, two questions must be answered: 1) Having in view the prevailing standard of skill and learning of gynecologists in the same locality in the exercise of ordinary care, should Dr. Lelich, upon having been informed by the appellant that she continued to bleed, have ordered X-rays earlier and diagnosed her condition as needing different treatment from that of the "watchful waiting" prescribed? 2) Was there, in view of the prevailing standard of practice of gynecologists in the Kaiser Plan any positive duty on Dr. Lelich to have kept a closer check on the appellant between June and October, by scheduling other appointments?

As to the first question, " 'A physician is not held to a higher degree of responsibility in making a diagnosis than in prescribing treatment. . . . When due care, diligence, judgment and skill are exercised a mere failure to diagnose correctly does not render a physician liable.' " (*Rising* v. *Veatch*, 117 Cal.App. 404 [3 P.2d 1023]; *Engelking* v. *Carlson, supra*.) A mistake in diagnosis in the present case was

alleged and proved and is conceded to have taken place. But it was not only necessary for the appellant to prove such mistake but also that the mistake was due to failure to exercise ordinary care, diligence and skill in making the diagnosis. Mere proof that the diagnosis was wrong or that the treatment was unsuccessful would not support a verdict (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 468 [234 P.2d 34, 29 A.L.R.2d 485]).

Here, while the record presents a clear case of mistaken diagnosis, respondents' expert witnesses testified that because of the appellant's tumor, an early pregnancy could not be detected by clinical examination or by X-ray; that the laboratory test for pregnancy was properly administered, and was the test customarily used for that purpose, and the only clinically feasible test in existence; that while not 100 percent accurate, the test was highly accurate; that a false "positive" result was unusually rare; that the fetal skeleton would not show up on an X-ray until four or five months; that it was not good practice to X-ray a pregnant woman before the fifth month because of the radiation danger to the fetus; that a normal pregnancy was possible with a tumor condition like the appellant's; that many women continued to bleed regularly throughout their pregnancy; that there were no other means for confirming the pregnancy; that appellant's life would be endangered by surgery if she were pregnant; that, therefore, the resulting approach of waiting for several months was in accord with the proper standards of practice. A doctor is not responsible for untoward consequences in the treatment of his patient, for he is not a "warrantor of cures" (*Johnson* v. *Clarke*, 98 Cal.App. 358 [276 P. 1052]) or "required to guarantee results" (*Sansom* v. *Roos-Loos Medical Group*, 57 Cal.App.2d 549 [134 P.2d 927]). Thus, we can only conclude that the appellant failed to establish a prima facie case on the basis of negligence in either the diagnosis or the treatment prescribed.

The second question as to whether Dr. Lelich had a duty to keep a more careful check on the appellant after her June visit presents more difficulty. Dr. Lelich testified that in June, he told the appellant to feel free to come in if she had any problems. Appellant testified that he did not tell her to come back or make this statement. In accordance with the above-mentioned rules for appeals from nonsuits and directed verdicts, we need to consider only the evidence most favorable to the appellant, so we must disregard the doctor's testimony.

The uncontroverted evidence establishes that no return appointment was made for the appellant in June, and that from June 19 until she came in of her own accord on October 29, appellant was not seen by a gynecologist. The testimony of respondents' expert indicated that asking appellant to come back was in accord with good medical practice. In appellant's condition, a spontaneous abortion which would result in heavy bleeding was also likely. The expert further testified that in his own private practice, a patient in appellant's condition would have been scheduled for further appointments and that he could not understand why the appellant was not seen and reevaluated in facilities that were open 24 hours a day and 7 days a week; that delay of three to four months was proper in this kind of case. Here, however, six months elapsed from the first indication of pregnancy at the end of April and the appellant's visit at the end of October, and over four months from the second pregnancy test in June until the end of October.

We think that from this testimony, a jury could have concluded that some of the delay of appellant's operation and the resulting damage to her was due to the failure of the doctor to keep a closer check on her after her June visit, and not in accord with good medical practice and was a failure to exercise ordinary care and skill of other doctors in the same locality.

Except for the testimony described above and the uncontroverted evidence relating to appellant's voluntary postponement of the surgery after October 29, no other evidence was presented as to whether the proper standard of care under the particular circumstances required the doctor to keep a closer check on the appellant and to schedule return appointments. Thus, we conclude that the judgment must be reversed for a trial of the respondents' negligence in this regard only.

Judgment reversed with directions to the trial court to proceed in accordance with the views expressed in this opinion.

Shoemaker, J., and Agee, J., concurred.

A petition for a rehearing was denied June 15, 1962, and respondents' petition for a hearing by the Supreme Court was denied July 11, 1962. Traynor, J., was of the opinion that the petition should be granted.