[Civ. No. 20911. First Dist., Div. Two. April 20, 1964.]

MARIA SANCHEZ, Plaintiff and Appellant, v. RAIMUNDO RODRIGUEZ, Defendant and Respondent.

Elmer P. Delaney and Hugh B. Miller for Plaintiff and Appellant.

Peart, Baraty & Hassard and Robert D. Huber for Defendant and Respondent.

TAYLOR, J.—This is an action to recover damages for injuries to the plaintiff's left arm sustained as the result of alleged malpractice and negligence in the performance of certain emergency procedures to save her life after she suffered

a vascular collapse following abdominal surgery. ▮ The plaintiff settled with the defendant, Mt. Zion Hospital, and the only issue on this appeal is whether the court properly granted a nonsuit at the trial of the remaining defendant, Dr. R. Rodriguez.

▮ A nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. A legitimate inference must be founded on a fact legally proved (Code Civ. Proc., § 1960). In this light, we examine the evidence in this case (*Kopfinger* v. *Grand Central Public Market,* 60 Cal.2d 852, 855 [37 Cal.Rptr. 65, 389 P.2d 529]).

In 1956, appellant, Maria Sanchez, was 32 years old and had several operations during the preceding year, including an appendectomy, tubal ligation, cholecystectomy and hemorrhoidectomy, all performed by other doctors. As she was still suffering from severe abdominal pain and nausea, she was admitted to Mt. Zion Hospital in November for observation and tests under the care of Dr. Rodriguez, a surgeon. The tests confirmed his preliminary diagnosis of pancreatitis due to biliary tract disease resulting in a partial intestinal obstruction. On December 7, appellant was readmitted to Mt. Zion Hospital for a laparotomy, an abdominal operation to explore and correct her condition. Respondent Rodriguez, assisted by two staff doctors, Dr. Shapiro and Dr. Spiro, and the anesthesiologist, Dr. Krutchkoff, performed the operation on December 10. Before the operation, appellant was in good condition and had a blood pressure of 90-100/60, normal for a woman of her age and size. During the operation, she received a blood transfusion of 500 cc.'s in her left arm to replace the normal amount of blood lost. The operation lasted from 12:30 p.m. to 4:45 p.m. The anesthesiologist's records show that at the conclusion of surgery, appellant's condition was satisfactory, with a blood pressure of 90/60. Respondent left the hospital after placing appellant in the care of the anesthesiologist in the recovery room.

The nurse's notes show that at the time appellant was removed to the recovery room at 4:45 p.m.,[1] appellant's

---

[1]There was no evidence in the record of the distance from the operating room to the recovery room, although it was indicated it would take several minutes to transfer a patient there.

blood pressure was down to 60/? At 4:46 p.m., on the orders of Dr. Krutchkoff, appellant intravenously received caffeine and desoxyn, and "shock blocks," or elevation of her feet. All of these measures were designed to raise blood pressure. At 4:48 p.m., appellant was conscious and talking; her blood pressure was 80/70. At 4:55 p.m., her blood pressure dropped to 60/?, and at 5 p.m., she was given 500 cc.'s of whole blood under pressure. At 5:15 p.m., 2 cc.'s of the drug "Levophed" were administered by Dr. Krutchkoff and other staff doctors who ordered another 4 cc.'s at 5:50 p.m. "Levophed," the trade name for norepanefrin, a substance chemically similar to the secretions of the adrenal glands, is an exceedingly potent drug used for major shock. The drug functions by radically constricting the arteries and veins and may produce undesirable side effects. Necrosis (death of tissue) in the immediate vicinity is a well-recognized complication of the use of the drug. The drug and other substances were administered intravenously through appellant's right arm.

As appellant's blood pressure and pulse continued to recede, the hospital got in touch with Dr. Rodriguez at his office around 6 p.m. He arrived at the hospital at 6:20 p.m. Appellant's condition continued to decline. At 6:35 p.m., she was given the Last Sacraments with members of her family present. At 7:30 p.m., appellant had no blood pressure or pulse. Dr. Rodriguez, in an attempt to save her life, did an arterial cut-down on her left wrist while fluids and other substances were intravenously fed through the right arm. After applying an antiseptic solution to the wrist, Dr. Rodriguez performed the cut-down with a special kit provided by the hospital to introduce blood directly into the wrist artery to increase the pumping of the heart. The procedure involves various risks including gangrene and the loss of the hand because of the necessary binding or ligation of the arteries and because the blood supply to the extremity is temporarily cut off. A special hollow needle is used, then closed with a stylette and left in the artery, with a corner of the wound open, pending further developments.

Immediately after the cut-down, appellant's condition improved. By midnight, she was out of danger. The evening of December 10 and again the next day, she complained of pain at the cut-down site. Dr. Rodriguez assumed that the pain was caused by the cut-down and the presence of the needle which, pursuant to the usual procedures, had been left in the artery and so informed appellant. As appellant continually

complained of pain in the left wrist in the area of the cut-down, she was given pain killers. Antibiotics were administered on December 11 and again on December 12, after the removal of the needle. The wound was dressed. Appellant first noted discoloration of her left arm on the 13th and early in the morning asked a staff doctor to look at it. On the 14th, Dr. Rodriguez noted the discoloration and that evening prescribed drugs and heat treatments to the cut-down site, which were continued until her discharge. By December 16, appellant's arm had improved and appeared well healed on December 21, the day before her discharge.

After appellant's return home, the arm was very painful and appeared leathery and black in color and began draining. Respondent Rodriguez treated the arm at his office. Appellant also saw several other doctors and on February 7, 1957, was admitted to the French Hospital under the care of respondent. At respondent's request, Doctors Levin and Feinstein examined appellant to determine the appropriate course of treatment. After appellant had been at the French Hospital for about 11 days and before respondent had been able to complete the surgery and other contemplated treatment, appellant left the hospital without his knowledge and permission. She was taken home by her husband and subsequently seen by several other doctors.

On February 22, appellant saw Dr. Erskine who first treated her at the Stanford Hospital from February 27 to March 2. By March 29, the wound was completely healed but her finger sensations and movements were restricted. Doctor Erskine stated that it was difficult to determine the cause of this neurological defect. For a period of time, there was evidence that the nerve was recovering. Then appellant fell on the stairs at her home, grabbing the banister rail rather forcefully. After the banister incident, Dr. Erskine concluded that the recovery of the nerve had apparently been arrested.

On July 12, appellant was readmitted to the Stanford Hospital under the care of Dr. Erskine who performed exploratory surgery to ascertain the nature of the nerve difficulty. He exposed the median nerve, found it to be completely normal, and not damaged in the cut-down or buried in scar tissue. The cut-down site was $\frac{1}{2}$ inch to 1 inch from the nerve. Dr. Erskine, however, noted that appellant was suffering from a clinical condition called "transverse carpal syndrome," i.e., a tightening of the ligament across the wrist

which impairs the functioning of the nerve. He split the ligament and thereafter the wound healed and appellant recovered almost full use and sensation of her hand and fingers. Appellant was discharged from the hospital on July 15 and saw Dr. Erskine only once more, on July 24. In 1958, appellant was admitted to the San Francisco Hospital for slashing her wrists with a razor in order to "cut out the pain."

## RES IPSA LOQUITUR

We first consider whether this is a proper case to invoke the doctrine of res ipsa loquitur. The negligence of a physician or surgeon will not be assumed but must be affirmatively proved by the plaintiff unless the doctrine is applicable (*Stephenson* v. *Kaiser Foundation Hospitals*, 203 Cal.App.2d 631 [21 Cal.Rptr. 646]). Res ipsa loquitur creates an inference of negligence ". . . where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible." (*Davis* v. *Memorial Hospital*, 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]). This inference will, of course, actually support a judgment against the doctor unless he is able to disprove the charge of negligence.

Appellant relies on *Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258] and other related cases for the proposition that res ipsa loquitur applies where a patient, while unconscious on an operating table, receives injuries to a healthy portion of his body not the subject of surgery or treatment. In *Salgo* v. *Leland Stanford etc. Board Trustees*, 154 Cal.App.2d 560 [317 P.2d 170], Justice Bray, in a well-reasoned opinion, stated: ". . . an examination of those cases shows that while at first blush it appears that it is the mere fact that the patient is under anesthesia that causes the doctrine to apply, actually it is not so, and the *doctrine applies because the results were ones which either laymen or medical men know ordinarily do not occur without negligence.*" (Italics added.) (P. 570.)

No question is raised as to the proper performance of the abdominal surgery, and it is not within the knowledge of laymen that plaintiff's *postoperative condition*, or the results of the treatment rendered therefor ordinarily do not occur in the absence of negligence. The record shows that both the administration of Levophed and the arterial cut-down are

446

medical procedures of a complicated nature used in emergency situations and that their justification and the risks involved are entirely outside the realm of lay knowledge. Thus, the standard of care against which the acts of respondent are to be measured is a matter peculiarly within the knowledge of experts and expert evidence is conclusive (*Stephenson* v. *Kaiser Foundation Hospitals, supra,* at p. 635).

The only medical evidence presented was that of respondent under Code of Civil Procedure section 2055 and Dr. Erskine who subsequently treated the patient. Neither testified that the results here were such that medical men know ordinarily do not happen in absence of negligence. The only expert evidence in the record indicates that gangrene and loss or impairment of the hand were calculated risks of the use of Levophed and the arterial cut-down, which involved cutting off the blood supply to the hand and binding the artery. Respondent testified that these risks had to be balanced against saving the appellant's life. There was no evidence that the procedures were contrary to good medical practice or that those rare cases where tissue death occurs are more probably than not the result of negligence.

The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation (*Siverson* v. *Weber,* 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97]; *Dees* v. *Pace,* 118 Cal.App.2d 284 [257 P.2d 756]).

As we recently said in *Mundt* v. *Alta Bates Hospital,* 223 Cal.App.2d 413 [35 Cal.Rptr. 848], quoting from *Siverson* v. *Weber, supra,* in deciding a similar point: " 'To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible.' " (P. 422.) The doctrine is not applicable in the instant case.

## ALLEGED ACTS OF NEGLIGENCE

Appellant in addition to relying on res ipsa loquitur claims certain specific acts of negligence. She charges that respondent negligently left the operating room when she was in critical condition. The anesthesiologist's notes recorded appellant's blood pressure as normal at 4:45 p.m. when surgery was completed. The nurse's first note read: "4:45 BP 60/? P 132 R 20 to Rec. Rm." Respondent testified that when he left the patient in charge of the anesthesiologist, an M.D., on the completion of the operation, appellant's blood pressure was normal but that had her blood pressure been 60/?, appellant would have been in shock and it would not have been good standard practice for him to leave and allow her removal to the recovery room without administering treatment. Appellant thus contends that the nurse's notes establish a prima facie case of respondent's negligence.

Respondent, under Code of Civil Procedure section 2055, testified that the anesthesiologist keeps the records in the operating room and the nurse in the recovery room and that the nurse's notes indicate shock after appellant was removed to the recovery room. The manner of keeping hospital records is not within the knowledge of laymen. Appellant did not call the nurse or any other qualified witness to refute the clear, positive and uncontradicted testimony of the doctor (*Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509, 518 [305 P.2d 36]). The inference created by the nurse's notes having been thus dispelled, a judgment based thereon would be conjectural and speculative (*Bardin* v. *Case,* 99 Cal.App.2d 137, 142 [221 P.2d 292]).

We further note that appellant was left by respondent in the care of a doctor and the nurse's notes show that her condition was carefully watched and that she received prompt and proper treatment. There was no expert testimony of any omission or inadequacy in the treatment or that it would have been any different had respondent remained with the patient.

Appellant next asserts that the Levophed which had been injected into her right arm some time prior to the arterial cutdown extravasated and that failure to treat the extravasation resulted in dead tissue around the cut-down and the gangrenous condition. *There was no evidence to support appellant's theory.* Dr. Erskine testified that even without extravasation, the administration of Levophed can cause necrosis

of the tissues and that this is one of the calculated risks. Dr. Rodriguez testified that no extravasation did occur or could have occurred at the time of the cut-down as the drug had circulated in appellant's system and was highly diluted.

Appellant contends that respondent was negligent in failing to wash down the left wrist with a saline solution before making the cut-down. The medical testimony indicated that saline solution was called for only in the event of leakage or extravasation of the Levophed. As stated previously, there was no evidence that this had occurred. Respondent cleansed the skin with an antiseptic before the cut-down and then administered Procaine, an anti-Levophed substance, while performing the procedure. There is no evidence that this was not pursuant to accepted medical standards.

There is no evidence to support appellant's contention that the condition of her arm was caused by the use of unsterile instruments. The cut-down kit used by respondent was furnished by the hospital. There is no evidence that the heat treatment to her arm was not proper or resulted in her impairment. This treatment was administered by the hospital. Respondent administered antibiotics and Papaverin and applied dressings to the wound several times. There was no evidence that this course of treatment was not in accordance with good medical practice or that different measures should have been taken. Clearly, the propriety of such treatment was exclusively a subject of expert opinion.

As to the alleged infection which occurred after appellant left the hospital, the expert testimony indicated that any open wound contains bacteria and that whenever there is gangrene, there is danger of infection. But there was no evidence that respondent disregarded this possibility or failed to prescribe the proper treatment. He continued to treat appellant's arm after she left the hospital and the doctors he had examine her at French Hospital recommended the same procedure subsequently followed by Dr. Erskine. Appellant left French Hospital without the knowledge of respondent and before the contemplated course of treatment had been completed.

We conclude that res ipsa loquitur does not apply in this case and that appellant has produced no evidence that respondent failed to exercise the care and skill required under accepted medical standards in performing the cut-down and the subsequent treatment of her wrist, nor has she established that any alleged failure of duty by respondent was a

proximate cause of the condition of her arm (*Marvin* v. *Talbott*, 216 Cal.App.2d 383 [30 Cal.Rptr. 893].) ██ A doctor is not a warrantor of cures nor is he required to guarantee results and in the absence of a want of reasonable care and skill will not be held responsible for untoward results (*Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485]).

Judgment affirmed.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied May 20, 1964.