Joshua ROMERO, a minor, by his father and next friend, Clifford A. ROMERO; Clifford A. Romero, and Roxanna A. Romero, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 90–867–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 15, 1992.

See also 954 F.2d 223.

Walter A. Oleniewski, Elizabeth N. Shomaker, Shulman, Rogers, Gandal, Pordy & Ecker, Rockville, Md., John W. Toothman, Shulman, Rogers, Gandal, Pordy & Ecker, Alexandria, Va., for plaintiffs.

Patricia J. Reedy, U.S. Dept. of Justice, Washington, D.C., Richard Cullen, U.S. Atty., E.D. Va., Dennis Szybala, Asst. U.S. Atty., Alexandria, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This case was tried before the Court, and upon evidence presented and argument of counsel, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On January 30, 1977, at age 17, Ms. Roxanna Romero was hospitalized in Jacksonville, Florida, for right lower quadrant pain. She underwent surgery for the removal of her right ovary.

2. On October 5, 1978, Ms. Romero was seen at the clinic at Camp Pendleton in California. Examination by an obstetrician at the OB/GYN clinic on November 14, 1978, revealed a left adnexal cyst (an accessory sac on the left ovary). Ms. Romero was placed on birth control pills to control her irregular menstruation. She was instructed to return to the OB/GYN clinic in six (6) weeks for further evaluation of the adnexal cyst.

3. Ms. Romero returned to the clinic on January 4, 1979. The physician noted that the left adnexal mass was gone. She was instructed to continue taking birth control pills and to return to the clinic in six (6) months.

4. On May 21, 1980, Ms. Romero presented to the clinic with complaints of abdominal pain with dysuria (difficulty or pain in urination). She was diagnosed with hemorrhagic cystitis (blood and inflamma-

tion of the urinary bladder) and was placed on antibiotics. Ms. Romero returned to the clinic on May 30, 1980, complaining of burning and itching within the urethra, lower abdominal pain, and vaginal itching. She was evaluated by the OB/GYN clinic. The obstetrician noted that her history was consistent with a right ruptured corpus luteum cyst.

5. On October 8, 1980, Ms. Romero presented at the clinic with complaints of abdominal pain and vaginal bleeding for three days. Examination revealed a closed cervix, a pregnancy at 6–8 weeks gestation and moderate to severe tenderness on the left side. The obstetrician performed a culdocentesis, which is aspiration of the fluid from the rectouterine area. The culdocentesis was negative, producing only one (1) cc. of clear fluid from the rectouterine area. The obstetrician concluded that Ms. Romero was suffering from a threatened abortion or possible ectopic pregnancy. Consequently, she was instructed to return home and remain on bedrest for 48 hours. Moreover, she was instructed to return to the clinic if she experienced any signs or symptoms of increased bleeding, pain, dizziness, or tissue passage. Ms. Romero was also instructed to return to the clinic on October 14, 1980 for a follow-up appointment.

6. Ms. Romero returned to the clinic on October 10, 1980. She stated that she felt "much better but [was] still spotting." The physician instructed her to remain on bedrest until she was seen at the OB/GYN clinic on October 14, 1980.

7. On October 14, 1980, Ms. Romero reported that she was "feeling better" and that the "vag[inal] bleeding had stopped." However, she continued to have left lower quadrant "ache." A pelvic examination revealed that her cervix was closed. She was again instructed to return to the clinic if she experienced any signs or symptoms of heavy bleeding, dizziness, or sharp pain.

8. On October 21, 1980, Roxanna Romero presented to the Naval Hospital at Camp Pendleton with complaints of vaginal bleeding and cramping pain. Examination revealed a closed cervix, blood in the vagina,

and a pregnancy at approximately eight (8) weeks gestation. Ms. Romero was admitted for observation, an ultrasound, and an obstetrical consultation. Her admitting diagnosis was "threatened abortion."

9. On October 22, 1980, it was noted that the "copious flow" of bleeding subsided, but she was still spotting. An ultrasound revealed an intact intrauterine pregnancy at eight (8) weeks gestation with a right adnexal cyst. Ms. Romero was discharged from the hospital. She was instructed to remain on bedrest until October 27, 1980, when she was to return for a follow-up examination.

10. Ms. Romero returned to the OB/GYN clinic on October 27, 1980. No spotting or cramping was observed. Consequently, she was permitted to return to duty.

11. Ms. Romero returned to the clinic on December 3, 1980, with complaints of abdominal cramping and vaginal bleeding since early morning. A pelvic examination revealed a tender uterus at 16 weeks gestation and a closed cervix with no active bleeding. She was diagnosed with threatened abortion and instructed to remain on bedrest for 48 hours. Ms. Romero returned to the clinic the next day with complaints of continued vaginal bleeding. The physician advised her to remain on bedrest and return to the OB/GYN clinic on December 8, 1980, as scheduled.

12. On December 8, 1980, the obstetrician documented that Ms. Romero presented with a 17 weeks gestation, abdominal tenderness, a closed cervix, and no vaginal bleeding. Because of the possibility of spontaneous abortion, Ms. Romero was instructed to remain on bedrest for an additional 48 hours.

13. On December 10, 1980, Ms. Romero presented to the Naval Hospital with complaints of vaginal bleeding for four to five days and moderate to severe lower uterine cramping. She was admitted for "observation, repeat ultrasound to rule out placenta previa and possibly to subsist out as she [was] unable to continue her present job with the vaginal bleeding and cramping...." Examination revealed dark blood

oozing from the external opening of the cervix.

14. Initially, the vaginal bleeding began to slow and the fetal heart tone remained strong. On December 11, 1980, Ms. Romero complained of increased vaginal bleeding with some clots. A pelvic examination revealed a closed cervix. On December 12, 1980, the bleeding and cramping stopped and Ms. Romero subsisted out. However, she returned that evening with increased vaginal bleeding and cramping which did not resolve with bedrest. By the evening of December 13, 1980, no fetal heart tones were palpable. Examination revealed a dead fetus which was contained in the amniotic sac. Consequently, the sac was ruptured and an intact dead fetus at approximately 16–18 weeks gestation was delivered. Ms. Romero was discharged to home on December 14, 1980, with a diagnosis of spontaneous abortion.

15. Ms. Romero had a spontaneous abortion with her 1980 pregnancy. Dr. Harger, defendant's expert obstetrician, Dr. Steven Richards, the treating obstetrician, and Dr. Steven Leviss, plaintiffs' expert obstetrician, agree that Ms. Romero had a spontaneous pregnancy loss in 1980 during her second trimester.

16. The (1) first trimester is defined as the first 13 weeks and two days gestation; (2) second trimester or midtrimester is defined as 13 weeks and three days gestation to 26 weeks and four days gestation; and, (3) third trimester is defined as 26 weeks and five days gestation to 40 weeks gestation.

17. An incompetent cervix is defined as painless dilation and effacement of the cervix with the resultant delivery of a premature pregnancy or loss of midtrimester pregnancy. One treatment for incompetent cervix is the placement of a cerclage or surgical suture around the cervix. The standard of care in California, in 1986, did not require the placement of a cerclage where an incompetent cervix is suspected.

18. The plaintiffs have failed to sustain their burden of proving that Ms. Romero's 1980 pregnancy loss was due to an incompetent cervix. It is Dr. Harger's opinion that Ms. Romero did not have an incompetent cervix with her 1980 pregnancy. Moreover, Dr. Leviss, plaintiffs' expert obstetrician, after reviewing all the records could not make such a diagnosis.

19. Ms. Romero presented to the clinic for a pregnancy test on November 4 and 23, 1982. Both tests were negative. On December 7, 1982, she reported that she had not experienced any menstruation for 11 weeks. She was diagnosed with amenorrhea and prescribed provera.

20. On September 26, 1982, Ms. Romero presented to the clinic with complaints of constant sharp pain to her right lower quadrant lasting one (1) week. A diagnosis of pelvic inflammatory disease was made and confirmed at the OB/GYN clinic. During an OB/GYN consult, on September 26, 1982, Ms. Romero reported that she and her husband had unsuccessfully attempted to conceive for the last 18 months. She was seen on December 14, 1982, and January 18, 1983 for continuing complaints of infertility. A laparoscopy was recommended. However, Ms. Romero declined to have such a procedure.

21. Ms. Romero presented to the clinic on March 2, 1984, with complaints of back pain since the night before. Examination revealed a normal cervix with a 5 cm. left adnexal mass.

22. On December 18, 1985, Ms. Romero presented to the emergency room at the Naval Hospital at Camp Pendleton, California, with complaints of severe abdominal pain. Specifically, Ms. Romero complained of a 10 day history of intermittent, sharp cramping, lower abdominal pain, poorly localized, first noticed while running. She also reported that she had an episode of spotting one week ago. However, she did not pass any tissue or blood.

23. Dr. Keefe, the emergency room physician, noted that Ms. Romero's last menstrual period was on November 9, 1985. Moreover, he noted that she had a history of a right ovarian cystectomy in 1977, and a miscarriage at four months in 1980. Upon examination, Dr. Keefe observed that Ms. Romero had mild left lower

quadrant tenderness without rebound or guarding. A pelvic examination revealed a small amount of mucus but no discharge in the vaginal vault; the cervix was closed with no discharge or bleeding; and the uterus was slightly enlarged.

24. Ms. Romero was admitted to the hospital at approximately 1900 hours for observation, frequent abdominal examinations, and an ultrasound. While hospitalized, Ms. Romero was followed with serial abdominal examinations. Throughout her hospitalization, her abdominal pain and tenderness remained unchanged. Moreover, no blood was noted at the cervical os (opening).

25. Shortly after Ms. Romero was admitted to the hospital she was examined by Dr. Hill. Dr. Hill noted the following symptoms:

[left lower quadrant] pain, worse [with] movement, sharp in character, lasting seconds [and] recurring [approximately every] 20–30 [minutes without radiation] still [without] fever, chills, nausea, vomiting.

Dr. Hill performed a pelvic examination which revealed a normal size uterus without tenderness, and a closed cervix. There was adnexal tenderness on the left side of her abdomen, however, no mass was palpated. Dr. Hill's assessment was "[rule out] ectopic [pregnancy] vs. cyst vs. torsion" (a twisting or rotating of a part).

26. Dr. Hill examined Ms. Romero again at 0330 hours on December 19, 1985. He documented that her condition was stable. However, he ordered continued close observation.

27. At 0700 hours, Dr. Hill noted that there was no significant change in Ms. Romero's pain pattern. Her pain remained sharp and intermittent and was greater on the left side of her abdomen. A decrease in her hematocrit level (the percentage of the volume of a blood sample occupied by a cell) was noted. Consequently, Dr. Hill ordered an ultrasound to "better evaluate the source of the pathology." Similarly, Dr. Steven Richards, a staff obstetrician at Camp Pendleton, examined Ms. Romero on December 19, 1985, at 0730 hours. His pelvic examination of Ms. Romero revealed an enlarged uterus and a tender left ovary of normal size. He agreed that an ultrasound was necessary to diagnose the etiology of her pain.

28. An ultrasound was obtained at 1000 hours on December 19, 1985. However, the ultrasound failed to reveal an intrauterine pregnancy even though she tested positive for a pregnancy. Dr. Richards considered the ultrasound to be non-diagnostic because of the age of the potential fetus.

29. A culdocentesis was performed at approximately 1335 hours on December 19, 1985. The culdocentesis was negative, revealing only .5 cc's of clear peritoneal fluid. In addition, the quantitative serial hormone levels were obtained in an attempt to rule out an ectopic pregnancy. However, the serial hormone levels were non-conclusive. In light of these findings, as well as her previous history of an exploratory laparotomy for an ovarian cystectomy, Dr. Richards decided that Ms. Romero was at risk for an ectopic pregnancy. Therefore, on December, 20, 1985, Ms. Romero underwent a laparoscopy and a possible laparotomy to determine the cause of her abdominal pain. The laparoscopy revealed a normal uterus and a left corpus luteum and a right small ovarian remanent with tuboovarian adhesions. The corpus luteum was excised and the adhesions were lysed. No evidence of an ectopic pregnancy was noted.

30. Shortly thereafter, Ms. Romero was discharged home with a diagnosis of presumed intrauterine pregnancy. She was instructed to maintain light duty for two weeks.

31. Ms. Romero presented to the OB/GYN clinic on January 7, 1986, for a follow-up visit. She informed Dr. Norwood that she was to be seen for follow-up after being hospitalized on December 15, 1985, for a possible ectopic pregnancy. Ms. Romero complained of "spotting last week but denie[d] passage of tissue [or] pain." Upon examination, Dr. Norwood noted that her uterus was anterior and 6–8 weeks gestation in size and that her cervix was

long and closed. Dr. Norwood advised her to continue her prenatal examinations and return if she experienced pain, bleeding or passage of tissue.

32. Ms. Smith, L.V.N., completed the initial prenatal chart and lab work and provided Ms. Romero with vitamin and iron tablets, and pamphlets regarding her pregnancy. Ms. Romero denied any complaints of pain of discomfort. Her next OB appointment was scheduled for January 14, 1986. In addition, Ms. Romero was instructed

REGARDING ACTIVITY, DIET, MEDICATIONS, AND NECESSITY FOR RETURN APPOINTMENTS. INSTRUCTED TO CALL HER PHYSICIAN IF SHE HAD ANY UNTOWARD SYMPTOMS.

33. Mrs. Romero returned for a routine OB prenatal appointment on January 14, 1986, with Dr. Steven Richards. Dr. Richards noted the following regarding her history:

(1) Laparoscopy [first trimester]—[rule out] ectopic [pregnancy]

(2) Asthma [at] age 12—not problem since

(3) Screen [diabetes mellitus approximately] 28 [weeks]

(4) [History second trimester] loss—[rule out] incompetent cervix [check every] 2 [weeks]

34. Ms. Romero returned for routine prenatal visits on the following dates:

February 4, 1986
February 18, 1986
March 4, 1986
March 18, 1986
April 1, 1986
April 15, 1986
April 29, 1986
May 6, 1986
May 13, 1986
May 27, 1986

35. Dr. Richards examined Ms. Romero on each prenatal visit—on February 4, 18; March 4, 18; April 15, 29; and May 13 and 27. On each of these visits, Dr. Richards performed a pelvic examination and documented that her cervix was closed. The parties' experts agree that Ms. Romero's cervix remained closed from December 18, 1985 to May 27, 1986. Further, the experts agree that Ms. Romero did not meet the diagnosis of incompetent cervix at any time prior to May 27, 1986.

36. On February 24, 1986, Ms. Romero presented to the clinic with complaints of sore throat, coughing, chest pain and difficulty breathing. She was diagnosed with an upper respiratory infection and prescribed rest, fluids, Sudafed, and Tylenol.

37. Ms. Romero presented to the emergency room on February 26, 1986, with continued complaints of 2–3 days symptoms of a cold with a cough and nose bleed. She stated that she had no problems with her pregnancy. Fetal heart tones were heard in the lower left quadrant and recorded at approximately 140–150 beats per minute. The emergency room physician noted that she appeared slightly ill with viral syndrome and upper respiratory infection.

38. Ms. Romero's complaints were still present during her routine prenatal visit on March 4, 1986. Dr. Richards prescribed Robitussin DM for her complaints.

39. Ms. Romero was seen at the OB clinic on March 18, 1986, for her routine prenatal visit. Ms. Romero complained of abdominal and back discomfort. Upon examination, Dr. Richards noted that her cervix was closed. A urine for culture and sensitivity was obtained to rule out a urinary tract infection.

40. On May 2, 1986, Ms. Romero presented to the clinic with complaints of light headedness and faint feeling. The physician noted that her blood pressure was 110/50 sitting; 120/54 lying; and 110/58 standing. He also noted that she was six (6) months pregnant. Ms. Romero denied any problems with her pregnancy. However, she stated that she had elevated blood pressure during her OB clinic visits. An appointment for May 6, 1986, was made with Dr. Richards to assess her blood pressure.

41. On May 6, 1986, Ms. Romero was examined by Dr. Richards regarding complaints of dizziness experienced the week

before. Dr. Richards documented that her blood pressure was "normal." Ms. Romero. did not have high blood pressure during her 1985 pregnancy.

42. On June 12, 1986, at 1953 hours, Ms. Romero presented to the OB/GYN clinic with complaints of " 'pushing' pressure feeling—it comes and goes. Started several days ago but has gotten worse today." Ms. Tammy Minkowski, L.V.N., noted that Ms. Romero's membranes were intact and there was no vaginal bleeding. Moreover, Ms. Minkowski documented a fetal heart rate of 146 beats per minute which was auscultated at the lower right quadrant of the abdomen. At 2020 hours, Dr. Reiners admitted Ms. Romero to the hospital. His initial exam revealed that she was completely effaced and completely dilated. He also noted that the fetus was in breech presentation. Ms. Romero's best estimation of gestational age was 30 + 4/7 weeks.

43. At 2025 hours, Dr. Reiners documented that Ms. Romero was in "obvious pain [with] contractions." Dr. Reiners auscultated a fetal heart rate of 140 beats per minute at the right lower quadrant of Ms. Romero's abdomen. Ms. Romero's chief complaint upon examination was "abdominal pain." She reported a "2 day[ ] [history of] contractions—got unbearable today." At 2026 hours, Dr. Reiners documented that Ms. Romero was admitted at 30 + weeks gestation. Her cervix was completely dilated and effaced and she was + 1 station. Dr. Reiners concluded that Ms. Romero needed to be delivered by caesarian section.

44. Ms. Romero was examined by Dr. Burson, the staff obstetrician, at ·2030 hours. Dr. Burson noted:

27 [year old gravida two para zero abortion one white female] admitted [at] 30 [weeks] gestation. Completely dilated [and] footling breech—membrane· bulging. Has had pain since yesterday. Plan—to [operating room] for [caesarian] section—Contact [pediatric] staff to standby.—possible transfer to San Diego ... Quick examination of need for surgery to [patient] and husband.

Ms. Romero signed a consent for the caesarian section at 2031 hours.

45. Ms. Romero was also assessed by Ms. Crothers, R.N., at 2030 hours. Ms. Crothers noted that Ms. Romero presented at the hospital in "premature labor and completely dilated" with complaints of "cramping." An ultrasound was performed to verify a footling breech presentation.

46. A primary low cervical transverse caesarian section was performed by Dr. Burson at 2050 hours on June 12, 1986. A male fetus was born at 2055 hours. Ms. Romero tolerated the procedure well and was discharged to home on June 14, 1986, at 1820 hours.

47. The plaintiffs have failed to sustain their burden of proving that Ms. Romero presented at the Camp Pendleton Naval Hospital at any time prior to June 12, 1986, with signs and symptoms of preterm labor. Ms. Romero was admitted to Camp Pendleton Naval Hospital on June 12, 1986, with complaints of 24—48 hours of abdominal pain and cramping, and she was completely dilated and completely effaced.

48. Plaintiffs contend that the standard of care in 1986 in California required the administration of tocolytics, bedrest, counseling, activity restriction, and steroids for the treatment of preterm labor. Because Ms. Romero was admitted on June 12, 1986, completely dilated and effaced, the standard of care did not require the administration of tocolytics and steroids. Moreover, plaintiffs' expert admits that the standard of care did not require a physician to administer corticosteroids for preterm labor. Second, Dr. Harger, Dr. Leviss, and Dr. Richards agree that there is no objective evidence that bedrest prevents preterm labor. Indeed, Dr. Leviss agreed that there are no controlled studies that conclude that bedrest prevents premature labor. Third, the Court finds that Dr. Richards met the standard of care in California in 1986 with respect to counseling Ms. Romero about preterm labor. Lastly, because Ms. Romero did not have a history of preterm labor, the standard of care did not

require Dr. Richards to restrict her activity level.

49. Ms. Romero returned to the OB/GYN clinic as instructed on June 16, 1986. Dr. Burton noted that Ms. Romero was "4 days [status post caesarian] section for premature labor [and] breech." Moreover, Dr. Burson noted that Ms. Romero's surgical incision was healing well. Dr. Burson also noted that Ms. Romero complained of "some numbness" in her right anterior thigh area. Ms. Romero continued to complain of right groin and thigh numbness and pain throughout 1986 and 1987.

50. The Court finds that plaintiffs failed to sustain their burden of proving that the insertion of a cerclage at 12–16 weeks gestation would have prolonged Ms. Romero's 1985 pregnancy. The Court finds that there is no objective evidence that demonstrates that the insertion of a cerclage where incompetent cervix is suspected prolongs the pregnancy.

51. Moreover, the Court finds that plaintiffs failed to sustain their burden of proving that had tocolytics been administered to Ms. Romero, Joshua's injuries would have been different. Dr. Leviss admitted that regardless of when tocolytics are administered, some patients will not respond to such treatment.

52. Further, the Court finds that plaintiffs failed to sustain their burden of proving that any of the physicians at Camp Pendleton were negligent in their treatment and care of Ms. Romero during her 1985 pregnancy.

53. Joshua Romero was born at 2055 hours on June 12, 1986. He weighed 1660 grams (3 pounds, 11 ounces). His APGAR scores were 2 at one minute and 6 at five minutes. Cord blood pH was obtained at delivery and noted to be 7.37. Joshua's care was immediately transferred to Dr. Cohen, a pediatrician, who was present at the delivery.

54. Initially, Joshua was bagged at 100% oxygen. When his heart rate did not increase after approximately 30 seconds, he was intubated and bagged at a rate of approximately 50 breaths per minute. His heart rate increased within 30 seconds to approximately 140–160 beats per minute and his color improved dramatically. Dr. Cohen, a staff pediatrician, noted that Joshua was probably 31 weeks gestation by Ballard exam.

55. Joshua was extubated in the operating room. Upon transfer to the nursery, it was noted that he was crying and had good air excursion. He was initially placed in a 40% oxygen hood. However, because his blood gas levels decreased, he was re-intubated at 2115 hours at 55% oxygen. Oxygen was eventually increased to 100% at 2220 hours in an attempt to improve his gas levels. Based upon examinations, chest x-rays, and blood gas determinations, Dr. Cohen concluded that Joshua had respiratory distress syndrome. At 2355 hours, Joshua was transferred to the care of Kaiser Permanente, a tertiary care center.

56. Plaintiffs contend that Joshua suffered fetal distress. The court rejects plaintiffs' contention. There is evidence of fetal well-being immediately prior to and at birth. A fetal heart rate of 146 and 140 was auscultated at 1953 and 2025 hours, respectively. A normal fetal heart rate for a 30–31 week gestation fetus is 140–160 beats per minute. Moreover, Joshua had a normal cord blood pH of 7.37 at birth. Normal blood pH is 7.35 to 7.45. Plaintiffs contend that Joshua Romero was acidotic at birth. However, Dr. Leviss admitted that he did not review Joshua Romero's complete June 12, 1986 birth record. Rather, Dr. Leviss reviewed only the birth record as to Joshua's APGAR scores. Additionally, Dr. Leviss admitted that a cord pH of 7.37 is not acidotic.

57. An APGAR score measures a term baby's color, heart rate, muscular activity, cry grimace, and respiration. Joshua had an APGAR score of 2 at one minute and 6 at five minutes. Dr. Leviss testified that an APGAR of 2 is more dangerous and indicates far more risk, potentially far more dangerous in a severely premature infant. Dr. Gluck, Dr. Cohen, Dr. Harger, and Dr. Richards agreed that a one minute APGAR score has no prognostic value. They agreed that Joshua had an APGAR of 6 at five minutes which was an acceptable

score for a premature infant. Joshua Romero's APGAR scores are not consistent with fetal distress. The Court finds that plaintiffs failed to sustain their burden of proving that Joshua suffered fetal distress.

58. Joshua Romero was admitted to Kaiser Permanente Hospital at approximately 0200 hours on June 13, 1986, in fair condition. A chest x-ray at 0225 hours demonstrated severe respiratory distress syndrome (RDS). Joshua's RDS remained unchanged throughout that evening. However, by 0830 hours on June 14, 1986, Joshua developed pulmonary interstitial emphysema (PIE) in the right lung.

59. Between 2136 hours on June 13, 1986, and 1654 hours on June 14, 1986, Joshua Romero's blood carbon dioxide level rose from 41.8 to 95.6. Normal blood carbon dioxide is approximately 40–45.

60. On June 14, 1986, at approximately 1654 hours, a neonatologist at Kaiser Permanente Hospital manually ventilated Joshua with an ambu bag at a rate of 150–180 breaths per minute in an attempt to decrease his carbon dioxide level. At approximately 1803 hours, Joshua was placed on a negative pressure ventilator. The purpose of the negative ventilator was to reduce the amount of pressure required to move air into and out of the lungs. Joshua's carbon dioxide level decreased gradually once he was placed on the negative ventilator.

61. Joshua responded to the manual ventilation and negative pressure ventilator and he began to stabilize. By June 17, 1986, the PIE was improving. Joshua was extubated on June 20, 1986.

62. On June 14, 1986, a head ultrasound was obtained on Joshua Romero. The ultrasound report states that "no hemorrhages" were noted. A head ultrasound was repeated on June 16, 1986. The report indicated that there were "no hemorrhages."

63. Another head ultrasound was obtained on June 20, 1986. The record indicates that "[s]ince the examination of June 16, 1986, the area of sonodensity to the left parietal lobe is increased in size. This represents an intraparenchymal hemorrhage." The radiologist concluded that Joshua suffered a "left parietal intraparenchymal hemorrhage."

64. Head ultrasounds performed on Joshua Romero on June 24 and 27, 1986, demonstrated no change in the size of the hemorrhage. On July 1, 1986, the radiologist noted that the left intraparenchymal hemorrhage had resolved.

65. After extubation, Joshua began having mild apnea (absence of breathing) episodes. He was placed on theophylline, a medication to stimulate respirations.

66. Joshua was discharged to Camp Pendleton Naval Hospital on July 11, 1986, for further growth and so that he could be close to his family. At the time of discharge from Kaiser Permanente Hospital, Joshua continued to have infrequent episodes of apnea requiring mild stimulation.

67. If there was a breach of the standard of care in the treatment and care of Joshua Romero, the evidence would indicate that the breach occurred at Kaiser Permanente Hospital when the physicians there failed to institute negative pressure ventilation in a timely manner in response to Joshua developing pulmonary interstitial emphysema (PIE). The evidence also indicates that due to the Kaiser physicians' failure to institute negative pressure ventilation, Joshua sustained elevated carbon dioxide levels for 12–14 hours. As a result of the elevated carbon dioxide levels, Joshua suffered a left parietal intraparenchymal hemorrhage. Moreover, it is probable that Joshua had bleeding around the ventricles of his brain as a direct result of the elevated carbon dioxide.

68. Joshua was re-admitted to the Camp Pendleton Naval Hospital on July 11, 1986, for continued observation, feedings, and growth. A physical examination at the time of admission showed a small white male with no obvious abnormality. Joshua continued to have difficulties with apnea (absence of breathing). However, the apnea gradually decreased, allowing discontinuation of theophylline on July 24, 1986. Joshua slowly developed anemia during his hospitalization. Consequently, he was

transfused with 50 cc's of packed red blood cells on July 29 and 30, 1986.

69. An ultrasound of the head was performed on July 30, 1986. Dr. Klien, a radiologist, opined:

Normal ultrasound evaluation of the ventricles. No evidence if hydrocephalus or residual hemorrhage.

70. Because Joshua was feeding and growing well, he was discharged home on August 1, 1986. Joshua weighed 2400 grams at the time of discharge and was ingesting approximately 120–130 calories per kilogram per day.

71. Joshua was seen at the pediatric clinic on August 8, 1986, by Dr. Cohen. Dr. Cohen concluded that Joshua was a growing premature infant. Because he was treated with 100% oxygen at birth, he was referred to ophthalmology for consultation to rule out blindness. The ophthalmologist concluded that the abnormal results "may be solely a manifestation of developmental immaturity."

72. On October 16, 1986, Dr. Cohen requested a second ophthalmology consult in light of the abnormal test of July 18, 1986. Joshua was evaluated by an ophthalmologist at the Naval Hospital on October 27, 1986. The test was inconclusive with respect to blindness. Hence, Joshua was referred for further testing at six (6) months of age.

73. The visual evoked response (VER) test was repeated at Children's Hospital and Health Center on January 8, 1987. The ophthalmologist concluded that the study "suggests good visual function albeit perhaps not to normal level."

74. On January 8, 1987, Joshua was evaluated by Dr. Howard Schneider at the Kaiser Permanente Nursery Follow-up Clinic. During the examination, Dr. Schneider noted that Joshua exhibited severe generalized hypertonicity (extreme tension of the muscles in the extremities). Dr. Schneider referred Joshua to the California Children's Services (CCS).

75. On January 5, 1987, Ms. Romero contacted Dr. Cohen at the Naval Hospital and requested that he contact Dr. Howard Schneider at Kaiser Permanente's high risk clinic regarding Joshua's "[decreased] muscle tone/[range of motion]." As requested, Dr. Cohen contacted Dr. Schneider. Moreover, Dr. Cohen noted that Joshua suffered a "small intracerebral bleed in the neonatal period." A four (4) month follow-up visit was scheduled at Kaiser Permanente Nursery Follow–Up Clinic.

76. Ms. Romero testified that Dr. Cohen spoke to her after talking to Dr. Schneider. Ms. Romero admitted that Dr. Cohen told her that Joshua had cerebral palsy.

77. Joshua was seen at the pediatric clinic on February 5, 1987, for follow-up of a fever and an ear infection. Dr. Cohen referred Joshua for a pediatric neurology consultation to rule out cerebral palsy. During his evaluation, Dr. Cohen discussed Joshua's diagnosis of cerebral palsy with Ms. Romero. Dr. Cohen also notified Ms. Romero where she could go in the hospital to obtain literature on cerebral palsy.

78. On February 9, 1987, Dr. Cohen completed a referral and authorization form for occupational therapy/physical therapy to be performed by California Children's Services "to prevent contractures or other deformities."

79. Joshua was evaluated on February 12, 1987, by Dr. Raymond Mehl, a pediatric neurologist. Dr. Mehl documented that Joshua had "spastic quadriplegia (an involuntary muscular contraction of all extremities) secondary to intracerebral hemorrhage." Dr. Mehl recommended that a CT scan be obtained and that he return for follow-up consultation in one month. Dr. Mehl testified that on February 12, 1987, he informed one or both of Joshua's parents that Joshua had cerebral palsy and that the cerebral palsy was caused from the hemorrhage or bleeding in the brain.

80. Shortly thereafter, on March 3, 1987, Joshua was seen by Dr. Cohen in the pediatric clinic. Dr. Cohen's diagnosis was "spastic quad[riplegia]."

81. On March 4, 1987, Joshua Romero was admitted to the San Diego Naval Hospital with a diagnosis of "cerebral palsy/spastic quadreparesis." He was scheduled to have a CT scan of the head to

evaluate the severity of his cerebral palsy. However, the CT scan was canceled because Joshua was suffering from an ear infection. Joshua was discharged on March 5, 1987. The nurse noted that the parents verbalized knowledge of Joshua's "diagnosis."

82. Joshua was readmitted to San Diego Naval Hospital on March 25, 1987, with a diagnosis of cerebral palsy. A CT scan was scheduled for March 26, 1987. On March 25, 1987, a social worker referred Ms. Romero to several organizations that work with handicapped children, including California Children's Services, San Diego Regional Center, and Project Hope.

83. A CT scan was performed on March 26, 1987. The CT scan was recorded as normal. Joshua was discharged on March 26, 1987.

84. Joshua Romero was born on June 12, 1986. Plaintiffs filed their administrative claims on April 12, 1989. The plaintiffs failed to file their administrative claims within the two-year statute of limitations. Consequently, plaintiffs' claims are barred.

85. Ms. Romero learned that she was pregnant with Joshua on or about December 18, 1985. Shortly thereafter, on January 14, 1986, she was examined by Dr. Steven Richards, an obstetrician at Camp Pendleton Naval Hospital. Dr. Richards noted that Ms. Romero had a history of a second trimester pregnancy loss in 1980 and decided that he would examine Ms. Romero every two (2) weeks to rule out an incompetent cervix.

86. Dr. Richards' routine practice was to discuss the consequences of an incompetent cervix with patients who are at increased risk of having an incompetent cervix. Moreover, Dr. Richards testified that he would have explained to Ms. Romero that it may become necessary to insert a cerclage, a surgical suture, if she developed symptoms consistent with an incompetent cervix.

87. Ms. Romero testified that Dr. Richards informed her that he would do a cervical exam every two weeks to check for an incompetent cervix. Moreover, Ms. Romero testified that Dr. Richards explained that a "incompetent cervix was where the uterus wall weakened and that by monitoring it, if it started to weaken, he could stitch it and prevent it from causing premature labor."

88. In July–August 1986, Ms. Romero told Ms. Murphy, a nurse at Camp Pendleton Naval Hospital that she was diagnosed with an incompetent cervix during her pregnancy with Joshua. Moreover, Ms. Romero told Ms. Murphy that she believed that the incompetent cervix was a cause of Joshua's premature delivery. Ms. Romero also told Ms. Murphy that she was surprised that her 1985 pregnancy made it as far as it did. In July–August 1986, Ms. Romero believed that she had an incompetent cervix and believed that the incompetent cervix was the cause of Joshua's premature delivery. Ms. Romero knew that a treatment for an incompetent cervix is the placement of a cerclage.

89. Joshua Romero was diagnosed with severe general hypertonicity and cerebral palsy on January 8, 1987. On February 12, 1987, Ms. Romero was informed that Joshua had spastic quadriplegia due to an intracranial hemorrhage. By March 3, 1987, Mr. and Mrs. Romero accepted Joshua's diagnosis of cerebral palsy.

## CONCLUSIONS OF LAW

Under the Federal Torts Claims Act (FTCA), the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the government for personal injuries "caused by the negligent or wrongful act ... [of its employees] while acting within the scope of [their] employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), and if the jurisdictional requirements of the waiver of sovereign immunity established through the FTCA are completely fulfilled. *Dalehite v. Unit-*

**580**

*ed States,* 346 U.S. 15, 30–31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953).

The federal district courts have exclusive jurisdiction to hear FTCA actions. 28 U.S.C. § 1346(b).

FTCA actions "may be prosecuted [only] in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402.

The substantive law of California applies to liability and damages in this case because California was the place where the complained of conduct occurred. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Taylor v. United States,* 821 F.2d 1428, 1431–32 (9th Cir. 1987), *cert. denied,* 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988).

■ In a medical malpractice case, a plaintiff must prove through the testimony of experts in the particular field that the medical treatment received fell below the degree of care ordinarily exercised in the same circumstances by a physician having the degree of learning and skill ordinarily possessed by practitioners in the same specialty and locality. *Huffman v. Lindquist,* 37 Cal.2d 465, 234 P.2d 34, 39, 41 (1951); *O'Connor v. Bloomer,* 116 Cal.App.3d 385, 172 Cal.Rptr. 128, 131 (1981); *Folk v. Kilk,* 53 Cal.App.3d 176, 126 Cal.Rptr. 172, 178–79 (1975); *Johnston v. Brother,* 190 Cal. App.2d 464, 12 Cal.Rptr. 23, 28 (1961); *Lamb v. Moore,* 178 Cal.App.2d 819, 3 Cal. Rptr. 507, 510–11 (1960).

"A medical expert is not qualified as a witness unless it shows that he is familiar with the standards required of physicians under similar circumstances." *Huffman v. Lindquist,* 234 P.2d at 41. Dr. Leviss, plaintiffs' expert obstetrician, does not render care to newborn infants. Dr. Leviss admitted that he has not received any formal training in the area of the premature infant, and that he does not hold himself out to be an expert in the area of neonatology.

■ The standard of care did not require Dr. Richards to insert a cerclage suture around Ms. Romero's cervix during her 1985–86 pregnancy. There is no credible evidence that establishes that the placement of a cerclage suture prolongs a pregnancy in the presence of an incompetent cervix. Rather, the Court finds that there is credible evidence that the placement of a cerclage suture for the treatment of an incompetent cervix has no effect on the prolongation of the pregnancy.

■ Ms. Romero did not suffer from preterm labor at any time from January 7, 1986 to May 27, 1986. The Court finds that Ms. Romero presented to the hospital on June 12, 1286, with a 24–48 hour history of cramping and pressure which became unbearable.

Ms. Romero did not have preterm labor prior to June 10, 1986. The standard of care in California did not require that Ms. Romero be hospitalized at an earlier date. The physicians at Camp Pendleton did not breach the standard of care in their treatment or care of Ms. Romero during her 1985–86 pregnancy.

Under the law of California, plaintiffs in a medical malpractice case must prove that the breach of duty, if any, was the proximate cause of the injury. Calif. Civil Code § 3333; *Bolen v. Woo,* 96 Cal.App.3d 944, 158 Cal.Rptr. 454, 459 (1979); *Folk v. Kilk,* 53 Cal.App.3d 176, 126 Cal.Rptr. 172, 179 (1975). The Court finds that Ms. Romero presented to Camp Pendleton Naval Hospital on June 12, 1986, completely dilated and effaced. Ms. Romero's pregnancy was terminated by caesarean section as a direct result of idiopathic preterm labor. The premature birth of Joshua was not caused by any negligent act or omission of the Navy physicians.

Plaintiff Joshua Romero contends that he is entitled to recover monetary damages for pain and suffering and mental anguish; past and future medical, nursing, rehabilitation and custodial care; and loss of future wages.

The FTCA statute of limitations requires each of the plaintiffs, including Joshua Romero, to present a separate administrative claim for the alleged damages each claims within two years of the accrual of

their respective causes of action. 28 U.S.C. §§ 2675(a) and 2401(b).

■ A "medical malpractice claim under the FTCA accrues when the claimant first knows of the injury and its cause." *Miller v. United States*, 932 F.2d 301, 303 (4th Cir.1991), citing *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

■ Failure of a plaintiff to comply with the FTCA jurisdictional prerequisite, set forth in 28 U.S.C. § 2675(a), of presenting an administrative claim within two years of accrual of its respective action bars that action for lack of subject matted jurisdiction. 28 U.S.C. § 2401(b). *Gould v. Dep't of Health and Human Servs.*, 905 F.2d 738, 741 (4th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991).

■ The plaintiffs' action accrued no later than February 12, 1987. On February 12, 1987, Dr. Raymond Mehl informed Mr. and Mrs. Romero of his findings that Joshua Romero had "spastic quadriplegia due to intracranial hemorrhage." Further, during her 1985–86 pregnancy, as well as shortly thereafter, Ms. Romero admitted that she believed that she had an incompetent cervix and that the incompetent cervix resulted in the premature delivery of her son.

■ Since plaintiff Joshua Romero's administrative claim was not presented within two years of the March 3, 1987 date of accrual, but rather only on April 26, 1989, the Court finds that plaintiff Joshua Romero's action for recovery of monetary damages for past and future medical expenses, future lost wages, and pain and suffering is barred by the two year FTCA statute of limitations. 28 U.S.C. § 2401(b). Since Joshua Romero's primary cause of action is time-barred, Mr. and Mrs. Romeros' derivative causes of action for loss of filial consortium and for mental anguish are extinguished.

Plaintiffs Clifford A. Romero and Roxanna Romero each seek recovery in their respective actions for claims of extraordinary past and future medical, nursing, rehabilitation and custodial care; recovery for claims for alleged deprivation of filial love and companionship; and recovery for alleged mental anguish.

Plaintiffs Clifford and Roxanna Romero contend that their claims for alleged deprivation of filial love and companionship, and for mental anguish are not derivative of plaintiff Joshua Romero's action. The Court rejects plaintiffs' contention. *Hoyem v. Manhattan Beach City School Dist.*, 71 Cal.App.3d 866, 139 Cal.Rptr. 769, 772 (1977), *vacated in part*, (except for the holding dismissing the parents' derivative claims for loss of child's society and comfort, which was affirmed), 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851, 860 (1978).

Plaintiffs Clifford and Roxanna Romero contend that their derivative causes of action do not fail for lack of subject matter jurisdiction. The Court rejects plaintiffs' contention. Under the FTCA, a derivative cause of action is extinguished when the primary cause of action fails for lack of subject matter jurisdiction. *Cf. Grunch v. United States*, 538 F.Supp. 534, 537 (E.D.Mich.1982). Since Joshua Romero's primary cause of action lacks subject matter jurisdiction, his parents' derivative causes of action must be dismissed.

■ Even if the Court had subject matter jurisdiction of plaintiffs Clifford and Roxanna Romero's derivative claims for alleged deprivation of filial love and companionship, and for alleged mental anguish, their claims would nevertheless fail to state a claim under California law. Claims of deprivation of filial love and companionship and mental anguish are not recognized or awarded under California law. Further, parents of an injured child cannot state a cause of action for loss of filial affection, society or consortium regardless of the words, however artfully, they use to phrase their claim. *Baxter v. Superior Court of Los Angeles Cty.*, 19 Cal.3d 461, 138 Cal. Rptr. 315, 563 P.2d 871, 872–73 (1977); *Martinez v. Los Angeles Cty.*, 186 Cal. App.3d 884, 231 Cal.Rptr. 96, 103–04, (1986).

Assuming *arguendo* that plaintiffs Clifford and Roxanna Romero could state a valid cause of action for loss of filial consortium and for alleged pain and suffering, under California law, these claims constitute derivative actions. In the absence of primary liability to the child, there is no derivative liability for such alleged injuries of the parent. *Hoyem v. Manhattan Beach City School Dist.*, 71 Cal.App.3d 866, 139 Cal.Rptr. 769, 772 (1977), *vacated in part*, (except for the holding dismissing the parents' derivative claims for loss of child's society and comfort, which was affirmed), 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851, 860 (1978). When the primary claim fails, the derivative claims cannot survive.

For the reasons stated, judgment is entered on behalf of defendant United States of America.